[Civ. No. 7175.   Third Dist.   Feb. 5, 1946.]

MARJORIE M. SCHAAD, Appellant, v. EARL J. HAZEL-TON, as Executor etc., Respondent.

Curtiss E. Wetter for Appellant.

J. K. Burnett, Duard F. Geis and Alfred E. Frazier for Respondent.

ADAMS, P. J.—This action was brought by plaintiff, the daughter of Addie M. Hazelton, deceased, to recover from the estate of said decedent the sum of $21,178.83 claimed to be the reasonable value of services rendered by her to said decedent from July 1, 1926, to March 10, 1943, "in serving as companion, housekeeper, nurse, furnishing transportation, sewing, washing, ironing and otherwise" for said Addie M. Hazelton, "with the understanding and agreement between said Addie M. Hazelton and Plaintiff that said Addie M. Hazelton would compensate Plaintiff for said services by leaving to her . . . one-half of all the estate of said Addie M. Hazelton and which estate should include all the property of said Addie M. Hazelton except the home of said Addie M. Hazelton and the home of Earl J. Hazelton." The filing of a claim against the estate of the decedent and its rejection were alleged, a copy of the claim being attached to the complaint. The action was tried before a jury and resulted in a verdict in favor of plaintiff for the sum of $4,300. Thereafter, on motion of defendant, the trial court entered a judgment in favor of defendant notwithstanding the verdict, and this appeal followed.

The only question before this court is whether there was produced before the trial court evidence which, viewed in its most favorable aspect, was sufficient to support the jury's verdict.

J. B. Hazelton and Addie M. Hazelton were husband and wife. They acquired considerable property, including a substantial home and a lumber yard in Orland. They had two children, Marjorie and Earl, both of whom were, in March, 1926, of adult age. The daughter, who was apparently unemployed, was living in the home of her parents, and the son, who was then working for his father in the lumber yard, was married and occupied a home of his own in Orland.

On July 10, 1926, plaintiff married Clarence Schaad. She brought her husband into the home of her parents where they continued to reside until May 1, 1931, when they moved to Willows, and later, to Sacramento. In July, 1934, when Mr. Schaad lost his job they returned to the Hazelton home where they continued to reside. A son was born to the Schaads in 1927, and he, too, lived in the Hazelton home with his parents. On August 5, 1941, J. B. Hazelton and Addie M. Hazelton executed a deed conveying to their daughter the family home in Orland. This deed was deposited with the attorney who had drawn same, with instructions to deliver it to the grantee upon the death of the survivor of the grantors. Prior to his death J. B. Hazelton, who was suffering from cancer, conveyed his property to his wife, and on February 23, 1942, he died.

Mrs. Hazelton died in April, 1943, leaving a will dated April 3, 1942, in which she gave the family home, variously valued at from $8,000 to $15,000, and its contents, appraised at $1,100, to her daughter, reciting that a deed to the home had already been placed in escrow. The will also stated that prior to her husband's death they had agreed between them and their children that all debts owing by their son, and by their daughter and her husband, either to them or the lumber company, were forgiven, and that it was her will that they be canceled. The will devised to plaintiff a life estate in certain other real property with remainder to her children, which property was given value of $5,000 to $8,500, gave the lumber mill and business and other real property to the son, and divided the residue between the two children equally. The whole estate was appraised by the official appraiser at $44,929.86.

Plaintiff produced no evidence whatsoever of any express contract on the part of her mother to compensate her, either by will or otherwise, for any services she might or did perform in the home shared by the two families, nor was there any testimony that either of the parties ever made any reference to any such purported agreement. Appellant does not even contend in her brief that such evidence was produced, but argues that there *must have been* such an agreement because (a) at the time of a family conference held just before Mr. Hazelton's death he stated to his son that the daughter had been generous in asking that the debts of the son as well as her own be forgiven, and that he wanted them to share the

estate equally; (b) that the Schaad boy testified he had heard his grandmother say to his mother, more than once, that the estate was to be settled equally between the son and daughter; (c) that the Schaads paid rent, and (d) that the household expenses were apparently paid from what was called "the bank," into which Mr. Schaad and Mr. Hazelton both put money.

The statement in .appellant's brief that the Schaads paid rent is a conclusion based upon the testimony of the Schaad boy that he had seen his mother give his grandmother money for the rent, and had heard his grandmother ask for the rent. When this occurred or how many times, whether during the first or the second period of residence by the Schaads in the Hazelton home, or how much was asked or given was not stated. There was, however, testimony that Mrs. Hazelton had said to her daughter on one occasion that they did not pay rent—which was not denied by plaintiff. The statement in the brief that household expenses were paid out of a so-called "bank" is merely a conclusion from the testimony of the Schaad boy that in the kitchen was a brown purse called "the bank" into which he had seen both his grandfather and his father put money. When and how often this occurred, or what amounts were contributed by either was not stated; nor was there any evidence as to the purpose of these contributions or how or for what the moneys in the brown purse were spent; and there was no evidence that household expenses were paid out of it.

Regarding the services performed by plaintiff in the home of her parents, while there was testimony that she engaged in the general household duties, they appear to have been no different from those which she would have performed for her own family in her own home had she occupied one, except that, owing to operations which Mrs. Hazelton underwent in 1926, and in 1941, she was unable to raise her arms so as to reach the back of her head, and her daughter combed her hair for her, and during her convalescence, assisted in caring for her. It is true that after her operation in 1926 Mrs. Hazelton's health was not good, but it is undenied that except for short periods after her operations, she was able to and did assist with the housework, put up fruit, made the pies, doughnuts, etc., ironed, worked in her garden, washed dishes, did mending, and, during the infancy of the Schaad child, assisted in

caring for him. Apparently during the three years that the Schaads lived elsewhere she was able to run her own home. It is undenied, also, that at the time of Mr. Hazelton's last illness a nurse was in attendance for several weeks; and that another woman came in and worked for a few hours a day when Mr. Hazelton's condition was very critical. There was also a nurse in attendance during the month preceding Mrs. Hazelton's death. While there is some testimony that plaintiff, in her own car, at times took her mother to San Francisco and elsewhere and also performed personal services for her, the evidence fails signally to show that the services performed by her in the household were other than those which would naturally be performed by a loving and dutiful daughter in the home of her parents which she and her family shared with them; and their performance is insufficient to give rise to an inference that such services were performed for her mother any more than for her father, or for her husband and her son who alike shared the benefits of same, or that there was any intention on the part of the mother that she should pay for them, or any intention on the part of plaintiff that she should be paid for them.

The statements of the parents that their two children were to share equally in this estate was but natural, and do not imply that the daughter was to be paid for her services in the home; rather the contrary. Furthermore, appellant's claim that in 1926 her mother agreed to compensate her by leaving her one-half of all her estate "except the home of said Addie M. Hazelton and the home of Earl J. Hazelton," is fictitious on its face, since at that time Mrs. Hazelton had no estate, her husband being then living; and it is not reasonable that Mrs. Hazelton could have anticipated that her husband would predecease her, or that should she survive her husband, the home would be excluded from her estate, as it was by the subsequent deed executed by both Mr. and Mrs. Hazelton.

While as a general principle of law where one performs services for another at his instance and request the law implies a promise to pay, and the request may be inferred from circumstances, and that where one accepts or receives the benefit of another's work the law implies a promise to pay what the services are reasonably worth, the rule is founded upon a mere presumption of law which may be rebutted.

And where services are rendered between the members of a household or between those closely related by blood, the law will ordinarily presume that they were prompted by motives of love, friendship and kindness, rather than the desire for gain. And, as was said in *Winder* v. *Winder,* 18 Cal.2d 123, 127-128 [114 P.2d 347, 144 A.L.R. 935], "in order to support a claim for services made by a child or relation who remains with his parent or kin after majority the circumstances must show either an express contract or that compensation was in the contemplation of the parties." Also in that case the court cited and quoted from *Wainwright Trust Co.* v. *Kinder,* 69 Ind.App. 88 [120 N.E. 419], to the effect that while the intention to pay and the expectation of compensation may be inferred from conduct where equity and justice require compensation, and expectation of compensation may coexist with higher motives prompted by affection or the sense of duty, to warrant the finding of such contract, the elements of intention to pay on the one hand, and expectation of compensation on the other must be found to exist, though they may be inferred from the relation and situation of the parties, the nature and character of the services rendered, and any other facts or circumstances which may reasonably be said to throw any light upon the question at issue.

Appellant relies upon *Winder* v. *Winder,* asserting that the facts in that case and those in the case before us are parallel. We think them clearly distinguishable, for in the Winder case there was evidence that the mother, who was living alone, induced her son, the plaintiff, to live with her upon her promise to leave her property to him; also that the son paid his mother $25 a month as rent, furnished her with board and personal care, and paid all other expenses except medical, special nursing and hospitalization. There was also evidence that when, after an absence, the son resumed the care of his mother, she reaffirmed her promise to leave the home to him in return for his services. Also there the mother left all of her estate to others, with nothing to plaintiff. None of those facts appear in the present case.

In *Fuller* v. *Everett,* 100 Cal.App. 593 [280 P. 550], a daughter sought to recover from the estate of her deceased mother for the reasonable value of board and lodging, nursing and personal attendance furnished her mother, alleging that

the mother had come to the home of plaintiffs at her own request, and that the services and maintenance were rendered at her special instance and upon a promise to pay therefor. There was testimony that when the mother was ill she said to her daughter that she was going home with her; that the mother thereafter repeatedly remarked that her daughter took fine care of her, and that she would never regret what she had done for the mother; that the mother often said she intended to pay her daughter and pay her well, but never said when or how she would pay her. The court said that this presented appellant's case in its strongest light, but showed no meeting of the minds upon any agreed kind or amount of compensation; that to warrant an inference that one relative became indebted to the other for such service the evidence must be such as reasonably to indicate that it was the expectation of both parties that compensation should be made; that the presumption ordinarily prevailing, that the services were to be paid for, could not be invoked in such cases, but, on the contrary, as was said in *Ruble* v. *Richardson,* 188 Cal. 150, 157, [204 P. 572], quoting from 1 Beach on Contracts, "where services are rendered by members of a family, living in one household, to each other, or necessaries are supplied by one near relation to another, the law will presume that they were gratuitous favors merely, prompted by friendship, kindness and the relationship between them. And in such case, before the person rendering the service can recover, the express promise of the party served must be shown or such facts and circumstances as will authorize the jury to find that the services were rendered in the expectation of one of receiving, and by the other of making compensation therefor."

In *Ruble* v. *Richardson,* plaintiff, who was a niece of a Mrs. Kitchen, brought suit against the executor of Mrs. Kitchen's estate claiming payment for services rendered by her to decedent in whose home she lived as a daughter performing the ordinary services of a daughter. An implied contract to pay for such services was relied upon. The court said that in the absence of evidence of an express contract plaintiff was compelled to rely upon circumstances from which the law might raise an implied promise to compensate her for services rendered; but that evidence that she had performed the ordinary services of a daughter did not raise an inference in law that there was a promise to pay for the services rendered.

In *Murdock* v. *Murdock*, 7 Cal. 511, plaintiff who was the stepmother of defendants, at the request of defendants resided in their home as mother of the family for several years. Becoming dissatisfied, she left the home, and sued for compensation for her services. The court said that there seemed to have been no mutual expectation of compensation on either side; that plaintiff did not occupy the position of a servant in the family and was not so treated; and that "where a party sustains to others a certain relation, and assumes a certain position, inconsistent with the claim set up, the proof should either show an express contract, or conclusive circumstances from which a contract might be justly implied."

In *Farmer* v. *Underwood*, 164 Iowa 587 [146 N.W. 18], a daughter and her husband and their family came to live with the daughter's father and mother on their farm. From time to time the son-in-law worked on the farm doing general farm work. Nothing was said by either the father or the son-in-law as to payment of wages, except that some five or six years after the parties began living together, the son-in-law, needing money, stated that he was leaving to seek employment elsewhere, at which time defendant stated that if plaintiff wanted to work he could stay there and defendant would give him $25 per month. The court, in an action by plaintiff to recover for his services, directed a verdict for defendant, and on appeal the judgment was affirmed, the court saying that there was nothing to indicate that defendant at any time understood that plaintiff was working for him in expectation of remuneration, and nothing to indicate that defendant did not understand that plaintiff was there with his family, as a member of defendant's household, receiving support for himself and family, and that the services rendered by him were rendered in that capacity; that no express agreement for compensation was shown and that the facts and circumstances gave rise to no implication that plaintiff intended to charge for his services or that defendant intended to pay him therefor; that before plaintiff could recover, the evidence must disclose a mutual purpose and intent that the services should be paid for before the presumption that they were gratuitously rendered was overcome; and that plaintiff had failed to sustain the burden which rested upon him, to show these matters.

(Also see *Moulin* v. *Columbet*, 22 Cal. 508, 510; *Spadoni* v. *Giacomazzi*, 27 Cal.App. 149 [149 P. 51]; *Crane* v. *Derrick*,

157 Cal. 667 [109 P. 31]; *Newbert* v. *McCarthy,* 190 Cal. 723 [214 P. 442]; *In re Teynor's Estate,* 203 Wis. 369 [234 N.W. 344]; *In re Ghent's Estate,* 217 Wis. 631 [259 N.W. 865, 866]; *Donovan* v. *Driscoll,* 116 Iowa 339 [90 N.W. 60]; 28 R.C.L. §§ 13, 15, pp. 677-681.)

We are satisfied that the evidence relied upon by appellant as giving rise to an inference that the mother intended to pay her daughter for her services in the household, or that appellant contemplated that she should receive payment for same is insufficient, and that plaintiff failed to meet the burden imposed upon her, of proving either an express contract or circumstances from which a contract could be implied. The judgment notwithstanding the verdict is, therefore, affirmed.

Peek, J., and Thompson, J., concurred.

A petition for a rehearing was denied March 4, 1946.